OPINION OF THE COURT
Wayne A. Feeman, Jr., J.
introduction
This is an action for treble damages, pursuant to RPAPL 861, based upon the cutting and removal of trees on the plaintiff’s property. Having considered all of the evidence, consisting of testimony and exhibits, the court makes the following findings of fact, and reaches the following conclusions of law.
findings of fact
1) In 1973 plaintiff Roy Yarnell purchased a farm consisting of 278 acres, located south of Dryden Hill Road in the Town of Greenwood, County of Steuben.
*654 2) Roy Yarnell continued to own the farm in 1984 when the incidents upon which this action is founded occurred.
3) In 1984 defendant Robert David Baldwin (Robert Baldwin, Sr.) and his sons also defendants herein, Robert Harley Baldwin (Robert Baldwin, Jr.) and Ronald Harley Baldwin (Ronald Baldwin) were engaged as a partnership in the lumbering business, under the name of the Baldwin Lumber Company.
4) In the late spring or early summer of 1984, Robert Baldwin, Jr., contacted Roy Yarnell and inquired about the possibility of the Baldwin Lumber Company’s being granted a right-of-way through Yarnell property, over an old logging road, to allow access to timber on a neighbor’s property.
5) In July 1984 Robert Baldwin, Jr., came to the Yarnell property, and he and Roy Yarnell personally viewed and traversed the proposed right-of-way.
6) At that time Roy Yarnell orally agreed to permit the Baldwin Lumber Company to use the right-of-way as an access route, in consideration of which the Lumber Company agreed to give Yarnell certain oak planking.
7) The terms of the oral right-of-way agreement were not reduced to writing.
8) At the time the oral right-of-way agreement was negotiated, the path of the right-of-way was sufficiently clear and defined that no cutting or removal of trees was contemplated, or necessary, within the "boundaries” of the right-of-way itself.
9) When the right-of-way agreement was being discussed, Robert Baldwin, Jr., orally expressed an interest in purchasing certain timber on the Yarnell property located near the right-of-way.
10) Although the parties differ in their recollection of Roy Yarnell’s reply to the purchase proposal, the parties agree that the proposal was initiated by Robert Baldwin, Jr., and not by Roy Yarnell.
11) According to the plaintiffs, Roy Yarnell did not consent to sell any timber, and did not intend to sell any timber.
12) According to the defendants, Roy Yarnell did not decline to sell the timber, but rather consented to sell any timber in which the Lumber Company was interested.
13) Neither the offer of the Baldwin Lumber Company to purchase timber from Roy Yarnell nor the response by Roy Yarnell was reduced to writing.
*655 14) No evidence was presented as to an amount, or form, of consideration, if any, the Baldwin Lumber Company proposed to give in return for Roy Yarnell’s sale of the timber.
15) In mid-July 1984, after the right-of-way had been negotiated, the Yarnell family left their farm for a trip, and did not return to the farm until the last week of August 1984.
16) On September 12, 1984, the Yarnells, while taking a walk on their property, found evidence of substantial timbering, including cut and damaged trees and deeply rutted land surfaces.
17) The defendants concede that the subject timber cutting on the Yarnell property was done by the defendants, but contend that they had the Yarnell’s permission and insist that Robert Baldwin, Jr., made multiple attempts to contact Roy Yarnell, in person and by telephone, during the period of the Yarnells’ absence before the actual cutting began.
18) On September 12, 1984, after discovering the damage, Roy Yarnell telephoned Robert Baldwin, Sr.
19) According to the plaintiffs, Roy Yarnell stated to Robert Baldwin, Sr., during the telephone conversation that he (Roy Yarnell) had never given the Baldwin Lumber Company permission to cut the timber.
20) During the telephone conversation, Robert Baldwin, Sr., asked Roy Yarnell to telephone Robert Baldwin, Jr., which he did, on the same date (Sept. 12,1984).
21) During the telephone conversation with Robert Baldwin, Jr., Roy Yarnell was told that the Baldwins would be finished with the timbering within the next few days.
22) On the weekend after the telephone conversations took place, Robert Baldwin met with Roy Yarnell and a neighbor.
23) According to the defendants, Roy Yarnell at no time during the weekend meeting asked Robert Baldwin, Jr., "why [he] had cut the trees”.
24) At the weekend meeting, Robert Baldwin, Jr., gave Roy Yarnell an envelope containing "tally” or "scaling” slips pertaining to the cut Yarnell timbers, and also containing a check in the amount of $1,123.22 payable to Roy Yarnell.
25) Robert Baldwin, Jr., proffered the $1,123.22 check with the intent that it represent full payment for the purchase of the Yarnell timber and for "damages”.
26) Roy Yarnell rejected the check and eventually this action was commenced.
*656 27) According to the plaintiffs, at the time the cutting of the timber took place, the area in which the timber was located was "posted” with yellow and green signs identifying the area as a wildlife sanctuary.
28) The plaintiffs’ expert witness, a consulting forester, found a total of 233 trees cut or damaged, which contained an estimated 14,017 board feet and 88.36 standard cords of firewood.
29) The plaintiffs' expert witness identified the types of cut trees as white ash, beech, hard maple, red maple and several other species.
30) The plaintiffs’ expert witness estimated the aggregate value of the trees to be $2,849.42.
31) The plaintiffs’ expert witness estimated the cost of cleanup (defined as including "the removal of tree tops from the brook which flows through the cut area; cutting down tipped or broken trees left hanging in other trees which create a safety hazard; the removal of 'lonely hearts’; and the repair of skid trails and log landings”) to be $5,000.
32) The plaintiffs’ expert witness identified as an additional item of damage (which he was not able to quantify because of its subjective nature) "the loss of the wildlife value as a registered reserve, resulting from the cutting”, stating that "the wildlife which had previously been attracted to the site and prompted the registration and posting of the site will no longer be attracted to the site”.
33) The defendants’ expert witness, a consulting forester, estimated the volume of board feet to be 11,857, with an aggregate value of $937.72.
34) The defendants’ expert witness estimated the cost of clean-up to be $800.
APPLICABLE LAW
A. Liability
RPAPL 861 (1) authorizes a landowner to bring an action against "any person [who] cuts down or carries off any wood, underwood, tree or timber * * * or otherwise despoils a tree on the [owner’s] land * * * without the owner’s leave”.
In analyzing the liability element of this case, the critical question becomes "Did the Baldwin Lumber Company have the permission of Roy Yarnell to cut the subject timber?”
It is fundamental that "mutual assent is essential to the *657 formation of [an] informal contract” (1 Williston, Contracts § 22, at 46 [3d ed]).
Moreover, "the mutual assent must be manifested by one party to the other” (1 Williston, Contracts § 22, at 46 [3d ed]).
Restatement (Second) of Contracts § 18 provides: "Manifestation of mutual assent to an exchange requires that each party either make a promise or begin or render a performance.”
In weighing all of the evidence before the court, the court finds that the plaintiffs have satisfactorily shown an absence of "mutual assent”, and certainly an absence of a "manifestation of mutual assent”, to the proposal made by Robert Baldwin for the purchase of timber from Roy Yarnell.
The court concludes, therefore, that there was no "agreement” of the parties which would constitute sufficient "leave” of the "owner” to render RPAPL 861 (1) inapplicable.
While Roy Yarnell perhaps could have articulated in a less equivocal, more definite and more forceful manner, his rejection of the Baldwin offer to buy timber, the court determines that the plaintiffs have sufficiently shown the absence of permission or agreement to cut timber. The defendants, despite their prior commercial experience in timber cutting, elected to proceed without the benefit of a written contract, a factor which further militates against the defendants.
Since there is no factual question as to the ownership of the real property and the timber, and as to the identity of the party which did the cutting, the court concludes that it must rule for the plaintiffs on the issue of liability.
B. Damages
As far as the "damages” element of this case is concerned, the court must make a two-prong inquiry:
a) What was the actual damage suffered by the plaintiffs?; and
b) Are the plaintiffs entitled to treble damages, pursuant to RPAPL 861 (2)?
1. Actual Damage
Having weighed all of the evidence submitted by the parties, the court finds that it is not completely satisfied with, or persuaded by, either party’s assessment of the actual damage. The presented evidence on damages was not compelling for either party.
*658 For example, the defendants’ expert seemed to minimize the amount of board feet taken," and seemed to "underassess” the cost of reasonable clean-up.
On the other hand, the plaintiffs’ expert appeared to resolve any doubt as to the quantity of board feet taken and the cost of clean-up in favor of the plaintiffs.
The lack of testimony as to the availability or unavailability of the firewood cut leads the court to conclude that the plaintiffs are entitled to the benefit of all of the firewood remaining on the Yarnell property, but are not entitled to a monetary award for firewood which was removed by the defendants, if any, prior to the commencement of this action.
The court further concludes that the best measure of the value of the timber taken by the defendants is the amount reflected on the scaling slips, namely, $1,023.22.
As far as the reasonable cost of clean-up is concerned, the court finds the $800 amount proposed by the defendants’ expert to be substantially inadequate.
While the court considers the $5,000 amount proposed by the plaintiffs’ expert to be liberal, it is prepared to adopt that figure as more realistically accurate, than that suggested by the defendants.
Noting that the plaintiffs have incurred extraordinary expenses in the prosecution of this action, the court concludes that they are entitled to a taxable disbursement, in an amount not exceeding $250 for their expense in presenting expert proof on the issue of damages.
2. Treble Damages
The court now turns to the final and most difficult question in the case, namely, "should the actual damages sustained by the plaintiffs be tripled by virtue of subdivision (2) of RPAPL section 861?”
Under RPAPL 861 (2) (a) when it has been determined that a property owner is to be awarded damages, those damages are to be "trebled” unless the fact finder determines affirmatively that the injury was "causal and involuntary”. The statute contains another exception, dealing with a mistaken belief of ownership, which need not be considered under the facts of this case.
Given the potentially irreparable consequences of unauthorized timber cutting, and given the State’s interest in deterring such activity, the treble damages statute is based on *659 rational, sound considerations. The Legislature has manifested a clear policy of preventing this form of tortious conduct, thereby protecting property owners.
At the same time, however, given the punitive nature of the statute, it "must be strictly construed against the parties seeking its enforcement and in favor of the person being proceeded against” (56 NY Jur, Statutes, § 231, at 686).
The Court of Appeals has written: "In statutes giving a penalty, if there be reasonable doubt of the case, made upon the trial or in the pleadings, coming within the statute, the party of whom the penalty is claimed is to have the benefit of such doubt” (Chase v New York Cent. R. R. Co., 26 NY 523, 525).
The key words in the treble damages exception are "casual and involuntary”, which, the court notes, are set forth in the conjunctive, rather than the disjunctive. Hence, to avoid treble damages, the tort-feasors’ actions must have been not merely "casual or involuntary”, but rather "casual and involuntary”.
The word "casual” has alternative meanings. While usually synonymous with "accidental” or "not deliberate”, "casual” may also be interpreted as "occasional” or "occurring without regularity” (Webster’s New Collegiate Dictionary 173).
Because of the various definitions of the statutory term "casual”, it is not clear whether the Legislature was contemplating a fault test (i.e., "accidental”) or a frequency test (i.e., "occasional”). Resolving the terminological ambiguity in favor of the defendants, the court determines that the actions of the defendants may be deemed "casual”. Although their conduct effected the destruction or felling of over 200 trees, their conduct may reasonably be considered "casual” in that it occurred within a relatively short period of time (i.e., several days), as a single isolated operation, within one particular area of the plaintiffs’ property, and without recurrence.
To determine whether the defendants’ conduct was "involuntary” as well as "casual”, the court must return to its analysis on the issue of liability.
Although the court has found, as a matter of law, that the plaintiffs have shown an absence of agreement or consent to the timber cutting, the court is not prepared to deem the "refusal” by plaintiffs of the defendants’ offer to be so clear, so final, or so unequivocal as to subject the defendants to the drastic remedy of treble damages.
*660 The defendants have offered some proof, albeit controverted by the testimony of Roy Yarnell, that Roy Yarnell granted permission (or at least acquiesced in the defendant’s decision) to cut the trees. Similarly, there has been no showing of a gross, blatant, or deliberate disregard of any prohibitory instructions given the defendants by Roy Yarnell.
By deciding not to require a prior written contract or declaration of the rights, privileges, obligations, and prohibitions of the parties, the plaintiffs, too, risked the adverse consequences of informality.
Strictly construing the treble damages statute, the court concludes that the defendants may have reasonably, though mistakenly, believed they had the consent of Roy Yarnell to engage in cutting the trees. While such subjective belief would not suffice to shield the defendants from compensatory liability to the plaintiffs, such belief would suffice to shield them from punitive or "exemplary” liability to the plaintiffs.
Finally, the court notes that there has been no showing by the plaintiffs that the defendants acted with malice or in bad faith.
For the foregoing reasons and under the unique facts of this case, the court concludes that treble damages are not warranted.
The plaintiffs should be limited to single damages.
CONCLUSIONS OF LAW
1) The plaintiffs are entitled to the entry of a judgment against the defendants jointly and severally in the amount of $6,023.22.
2) The plaintiffs are not entitled to treble damages pursuant to RPAPL 861 (2).
3) Pursuant to CPLR 5001 (a) and 5004, the plaintiffs are entitled to prejudgment interest calculated from September 16, 1984, at the rate of 9% per annum.
4) Pursuant to CPLR 8101 and 8301, the plaintiffs are entitled to costs and necessary disbursements.
5) The plaintiffs are entitled to an exceptional taxable disbursement, not to exceed $250 for their expense in presenting expert proof on the issue of damages.